**Opinion issued December 12, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00542-CV

————————————

## IN THE INTEREST OF A.A., D.A., AND J.A., CHILDREN

On Appeal from the 315th District Court
Harris County, Texas
Trial Court Case No. 2011-07426J

## MEMORANDUM OPINION

In this accelerated appeal, appellant challenges the trial court's order, entered after a jury trial, terminating her parental rights to her three minor children.[1] In her third through seventh issues, appellant contends that the evidence is legally and factually insufficient to support the jury's findings that termination

---

[1] Although the jury also terminated the parental rights of the children's fathers, whose full names are unknown, they are not parties to this appeal.

of the parent-child relationship was in the children's best interests[2] and she knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being,[3] engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being,[4] constructively abandoned the children,[5] and failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children.[6] In her first, second, eighth, ninth, and tenth issues, appellant contends that the trial court erred in admitting certain evidence; allowing the withdrawal of deemed admissions; continuing, rather than dismissing, the case; and commenting on the weight of the evidence.

We affirm.

## Background

In May 2010, the Texas Department of Family and Protective Services ("DFPS") removed appellant's three children from her custody and placed them with a relative. The trial court granted DFPS temporary managing conservatorship.

---

[2] *See* TEX. FAM. CODE ANN. § 161.001(2) (Vernon Supp. 2013).

[3] *See id.* § 161.001(1)(D)

[4] *See id.* § 161.001(1)(E).

[5] *See id.* § 161.001(1)(N).

[6] *See id.* § 161.001(1)(O).

In June 2010, DFPS filed a petition seeking permanent managing conservatorship and termination of appellant's parental rights, however, the trial court dismissed the case without prejudice.

Subsequently, on December 2, 2011, DFPS filed the instant lawsuit, alleging neglectful supervision and physical neglect, based on the allegations in its 2010 lawsuit and subsequent events, and again seeking permanent managing conservatorship and termination of appellant's parental rights. The trial court entered an "order for protection of a child in an emergency," recognizing that the children had been removed, finding that there existed a continuing danger to their physical health and safety, and naming DFPS their temporary sole managing conservator, pending a full adversary hearing.

On December 5, 2011, after a hearing, the trial court entered a temporary order appointing DFPS managing conservator of the children and requiring appellant to comply with a DFPS Family Service Plan ("FSP"). The January 24, 2012 FSP required that appellant obtain and maintain legal and verifiable employment, obtain and maintain appropriate housing, "in which she is listed on the lease," refrain from allowing anyone with a criminal or DFPS history to reside in her home, allow caseworkers to visit and have access to her home for scheduled and unscheduled visits, and submit to a psycho-social assessment.

3

After a status hearing on April 4, 2012, the trial court issued an order in which it found that appellant had reviewed and understood the FSP and admonished appellant that "unless she [was] willing and able to provide the children with a safe environment, . . . her parental and custodial duties and rights may be subject to restriction or to termination or the children may not be returned to her." And the trial court adopted the FSP as if fully set out in its order.

After the trial court granted an extension of the statutory dismissal date,[7] trial commenced to a jury on May 14, 2013. DFPS Caseworker Teara Magee testified that on May 13, 2010, she received a referral in which it was alleged that appellant's children, who were two, six, and seven years old, were regularly unsupervised two to three hours each day and had been seen alone outside their apartment at night. The referral also alleged that the children were "dirty" and the youngest walked around without a diaper. A pest control technician reported that when he entered appellant's apartment, he found "feces all over the floor," open diapers laying on the couch, and open lunchmeat on the counter. He reported a "bad rodent infestation" and characterized the apartment as a "dangerous health sanitation situation" and "health safety hazard."

DFPS Investigative Supervisor Lashamia Lofton testified that on May 14, 2010, she went to appellant's home to investigate the referral. When she arrived,

---

[7] *See* TEX. FAM. CODE ANN. § 263.401(b) (Vernon 2008).

she saw three young children playing in the entry way of the apartment complex at the curb, with one of the children near the community pool. The children appeared dirty, had colds, and wore dirty, sagging diapers. Lofton observed the children for approximately fifteen minutes and then walked over to them. No adults appeared while she spoke to the children.

Lofton then spoke with appellant, who explained that she has three minor children and three adult children. Two of her adult children each have two children of their own. Lofton noted that appellant lives in a two-bedroom apartment with two of her adult children and a total of seven younger children. The children Lofton saw playing in the entryway of the complex were appellant's son, age two, and two of her grandchildren, ages one and three. Although appellant told Lofton that she was watching the children through her apartment window, Lofton noted that the window blinds were closed and the children at the front gate could not have been seen from the position of the window. Appellant then said that the children "knew" not to go into the street.

Inside the apartment, Lofton saw trash overflowing in the kitchen and bathroom, dirty dishes stacked, open containers of food, flies, and piles of clothing scattered throughout. Appellant told Lofton that it was the children's responsibility to clean the kitchen and bathroom areas. Although appellant admitted that she had been involved with DFPS on numerous occasions, she

5

refused to provide the names of the children's fathers, asserting that their names were irrelevant because they were not providing support. Appellant also admitted that she was unemployed and not receiving food stamps or Medicaid because she had not renewed her applications. She obtained the apartment in January 2010 with "income tax money," and, prior to that, had been "homeless." And she admitted that she had previously tested positive for marijuana use while pregnant with her youngest child.

On May 17, 2010, Lofton returned and spoke with one of appellant's adult daughters, who informed her that appellant had gotten into a fight with another of her adult daughters the day before. The younger children were not involved, but they were present. During the fight, the apartment windows were broken and law enforcement was called to intervene. Appellant then agreed to place her children with her sister, "Ruthie." Days later, one of the adult children tested positive for marijuana use. And, on June 14, 2010, appellant tested positive for marijuana use.

At Ruthie's house, Lofton interviewed appellant's then seven-year-old child, who said that she and her six-year-old sister had been responsible for cleaning appellant's house every day. The seven-year-old said that there had been a fight at her house the previous day between appellant and one of the adult children and law enforcement was called to the scene. She also noted that the two adult children

who live in the apartment "bring boys over," and they, along with appellant, smoke "cigars" that they make with "green things" from appellant's purse.

DFPS Caseworker Teara Magee testified that in April 2011, the trial court ordered appellant to report to her every Friday regarding appellant's attempts to obtain employment, but she had not complied. Magee further testified that in September 2011, appellant went to Ruthie's house unannounced to visit the children and a physical altercation ensued between appellant, one of her adult children, and Ruthie. Appellant threatened Ruthie and, during the altercation, appellant's adult child hit Ruthie's face, causing blood to spatter on Ruthie's car. According to Magee, the trial court then ordered that appellant have no further visitation with the children until the children's therapist provided a recommendation.

Magee visited appellant's apartment on November 15, 2011 and found appellant unemployed and living with her boyfriend. Magee saw mold on the floor from leaking ceilings, carpeting soaked with water, and an overflowing trash can, which "smelled like a dumpster" and was infested with insects. And there were dirty dishes stacked in the kitchen. Appellant told Magee that she was about to cook dinner, and she pulled "moldy" chili out of the freezer. When appellant moved a pot on the stovetop, roaches appeared. As Magee attempted to talk with appellant about the condition of the apartment, appellant "just laughed."

7

Appellant testified that she has six children by four different fathers, whom she did not identify, and she does not receive support. She explained that she has an extensive DFPS history in Michigan and Texas, has moved numerous times, and her children were not in school from October to December 2009 because she moved. In January 2010, appellant, her three minor children, two of her adult daughters, and their four children, moved into a two-bedroom apartment, but she "lost" her job days later. Since May 2010, when the three minor children were removed, she estimates that she has given Ruthie a total of $300 to $400 to support them.

Appellant further testified that she has lived with her boyfriend in his three-bedroom, two-bath apartment since January 2011. She explained that there is a school near her boyfriend's apartment, but she is unsure which grade her oldest child is in. And she noted that two of the bedrooms do not have any furniture for the children to sleep on because she has been unemployed since January 2010. In regard to her employment, appellant noted that she has been in cosmetology school, but has not been able to complete the program. Moreover, she explained that she has not seen her children since September 2011 because the trial court restricted her visitation after her altercation with Ruthie. And she has not called the children because Ruthie's telephone number has changed.

Appellant conceded that the trial court had ordered her to comply with the FSP, which included her obtaining stable employment, a stable place to live, and participating in anger management classes. She also conceded that under the FSP, she was not permitted to have anyone with a criminal or DFPS history living in her home. And although she understood that she had to comply with the FSP to have her children returned, she admitted that she had not fully complied with the FSP.

Kathy Sasser, the court-appointed guardian ad litem for the children, testified that appellant stated to her that she understood the requirements of the FSP, but she had not completed them because of a disagreement with a DFPS caseworker. Sasser noted that appellant is unable to demonstrate that she has learned anything from her parenting classes, has had multiple DFPS referrals, and consistently refuses to accept responsibility for why the children were removed from her. And appellant is "hostile" and refuses to complete the FSP. Thus, Sasser "strongly believe[s]" that it is in the best interest of the children that appellant's parental rights be terminated.

In her written report to the trial court, which was admitted into evidence, Sasser recommends that appellant's parental rights be terminated because, in the three years that the minor children have been with Ruthie, appellant has refused to complete important requirements of the FSP. Specifically, appellant has failed or refused to provide a safe, clean, stable home and obtain employment to support her

children. And she has resisted court-ordered anger management classes and taking the steps necessary to establish a proper and safe parental relationship. Further, even before the trial court had suspended her visits with the children, her visits were sporadic. In sum, Sasser opined that "the children will face substantial dangers to their physical health and emotional development if placed in [appellant's] care." Sasser noted that a favorable home study had been completed on Ruthie, who is licensed to provide foster care. The children are now in a safe, healthy, and secure environment, and they have bonded with Ruthie. Thus, Sasser recommended that the children remain with Ruthie, with the goal that she adopt them.

V'Lillian Wright, a licensed professional counselor who provides behavioral therapy for foster children, testified that she provided counseling for appellant's minor children in Ruthie's home from February 2011 to March 2012. She noted that two of the children are "very emotional" when they talk about the fight at Ruthie's house in September 2011. Although the children require a heightened amount of direction and attention, Ruthie is meeting their needs, and Ruthie's home "is a very loving place for all of the children," who are now involved in activities and encouraged.

Ruthie testified that when DFPS asked her to pick up the three children from appellant's home in May 2010, they were "dirty" and "smelled like urine," and she

10

was unable to bring any of their clothes with them. Ruthie explained that the children were behind on immunizations and needed dental care, and one child had "scaly, bloody eczema" that needed treatment. Now, the children are receiving regular medical and dental care. And the oldest is in learning resource classes at school. Ruthie's home, in which she has lived for two years, has six bedrooms and four bathrooms. Moreover, she has become a licensed foster parent and receives money from Fostering Connections to pay for the children's needs.

Ruthie further testified that prior to May 2010, "every time she visited" any of appellant's apartments, the conditions were unhealthy. Appellant had rats living in her last apartment, including in the oven. The children were routinely found in dirty diapers and did not appear to have been bathed, and appellant frequently did not have clean diapers on hand. Ruthie noted that appellant has been evicted at least four times, has had to move into motels with the children, and she was living in a motel in 2008 when one of the children was born. Moreover, after the children had been removed from appellant's apartment, she visited only approximately five times and, during the visits, appellant watched television and complained that the children "got on her nerves."

Constance Williams, a licensed professional counselor, testified that she conducted therapy sessions with appellant's minor children. Appellant's oldest child reported that while living with appellant, she experienced frequent hunger

11

and felt uncertainty regarding where she would be living. She explained to Williams that she and her younger sister were responsible for caring for the three youngest children in the house, and the child now wants to live with Ruthie. Williams also explained that Ruthie is a "stable provider," who offers the children consistency, structure, and a clean home. Thus, Williams opined that it is in the children's best interest to remain with Ruthie.

## Dismissal

In her first issue, appellant argues that the trial court erred "in continuing, rather than dismissing, this refiled parental termination case" because "DFPS waited a year before attempting to serve the alleged fathers" and "continuing the case harmed the children by prolonging instability and uncertainty for them." Appellant asserts that "in its Motion for Continuance in November 2012, DFPS cited only the need to give the alleged fathers advance notice of trial," but "DFPS served these fathers in the 2010 case and knew it had to serve them in this refile."

We review a trial court's grant of an extension of the dismissal date for an abuse of discretion. *See In re M.D.W.*, No. 02-13-00013-CV, 2013 WL 3326664, at *4 (Tex. App.—Fort Worth June 27, 2013, pet. denied) (mem. op.) (applying abuse of discretion standard to question of extension of dismissal date under section 263.401(b)).

The Family Code, in relevant part, provides as follows:

(a)    Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, *the court shall dismiss the suit affecting the parent-child relationship filed by the department* that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

(b)    Unless the court has commenced the trial on the merits, *the court may not retain the suit on the court's docket* after the time described by Subsection (a) *unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.* If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a). . . .

(c)    If the court grants an extension but does not commence the trial on the merits before the required date for dismissal under Subsection (b), the court shall dismiss the suit. The court may not grant an additional extension that extends the suit beyond the required date for dismissal under Subsection (b).

TEX. FAM. CODE ANN. § 263.401 (Vernon 2008) (emphasis added).

Here, the record shows that the trial court granted DFPS temporary managing conservatorship of appellant's three minor children on December 5, 2011, identifying the statutory dismissal date as December 5, 2012. *See* TEX. FAM. CODE ANN. § 263.401(a). On November 2, 2012, DFPS moved for a continuance "for the newly appointed attorney ad-litems to have 45 days' notice of trial." After a hearing, the trial court, pursuant to section 263.401(b), found that extraordinary

13

circumstances necessitated the children remaining in the temporary managing conservatorship of DFPS and appointment of DFPS as such continued to be in the best interest of the children. *See* TEX. FAM. CODE ANN. § 263.401(b). The trial court then extended the statutory dismissal date to May 31, 2013, and the trial commenced on May 14, 2013. *See id.*

Appellant does not make any record reference revealing that she objected to the trial court's extension of the statutory dismissal date. Thus, the issue is not preserved for our review. *See* TEX. R. APP. P. 33.1. Moreover, she has not shown that the trial court abused its discretion in granting the extension. Appellant asserts that the extension "contravene[s] public policy" in that custody cases must be afforded "a speedy resolution." The legislature has, however, specifically provided for a single statutory extension when the trial court makes the required findings, as here. *See* TEX. FAM. CODE ANN. § 263.401(b), (c).

Further, to the extent that appellant complains that the trial court erred in not dismissing the case, the record does not reflect that she moved for dismissal before trial on merits commenced. *See* TEX. FAM. CODE ANN. § 263.402(b) (Vernon 2008); *In re Dep't of Fam. & Protective Servs.*, 273 S.W.3d 637, 642 (Tex. 2009) (holding that statutory dismissal deadline is procedural, not jurisdictional).

Accordingly, we overrule appellant's first issue.

14

## Sufficiency of the Evidence

In her third through sixth issues, appellant argues that the trial court erred in terminating her parental rights as to each child because the evidence is legally and factually insufficient to support the jury's findings that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, constructively abandoned the children, and failed to comply with the provisions of a court order that specifically established actions necessary for her to obtain the return of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (N), (O) (Vernon Supp. 2013). In her seventh issue, appellant argues that the trial court erred in terminating her parental rights because the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights is in the children's best interests. *See id.* § 161.001(2).

In order to terminate the parent-child relationship under section 161.001, a party must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under section 161.001(1) and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Both elements must be established, and termination may not be based solely on the best interest of the

15

child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

*Standard of Review*

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has also concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights "is complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination

must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. at 747, 102 S. Ct. at 1391). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 256, 264–66.

In conducting a legal-sufficiency review in a parental-rights termination case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the State bore the burden of proof. *See id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so," and we "should disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d at 266).

17

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

### *Failure to Comply with Court Order*

In a portion of her sixth issue, appellant argues that the evidence is legally and factually insufficient to support the termination of her parental rights as to each minor child under Texas Family Code section 161.001(1)(O) because the FSP "did not 'establish the actions necessary for the parent to obtain return of the child.'" She asserts that the FSP "indicated that DFPS's goal with respect to [her] was "Alt Family: Relative/Fictive Kin, Adoption" and, therefore, "there was nothing [she] could do to achieve the return of her children."

Parental rights may be terminated when clear and convincing evidence establishes that a parent has failed to comply with the provisions of a court order that specifically stated the actions necessary for the parent to obtain the return of a child who has been in the permanent or temporary managing conservatorship of DFPS for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. TEX. FAM. CODE ANN. § 161.001(1)(O). Chapter 262 is titled "Procedures in Suit by Governmental Entity to Protect Health and Safety of Child," and subchapter B provides the procedures that DFPS may employ in order to remove a child for abuse or neglect. *Id*. §§ 262.001–.309 (Vernon 2008 & Supp. 2012). If a parent has neglected or endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child is considered to be "remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child." *In re E.C.R*., 402 S.W.3d 239, 248 (Tex. 2013).

Appellant does not dispute that the three minor children were in DFPS custody for at least nine months prior to termination of her parental rights, they were removed under Chapter 262 for "abuse or neglect," or she failed to comply with all the requirements of a court-ordered FSP. Instead, she argues that the FSP does not comply with subsection (O) because it fails to "specifically establish[] the actions necessary for [her] to obtain the return" of her children.

19

The trial court's December 5, 2011 order granting DFPS temporary managing conservatorship of the children expressly states,

10. Finding and Notice

The Court finds and hereby notifies the parents that *each of the actions required of them below are necessary to obtain return of the children*, and failure to fully comply with these orders may result in the restriction or termination of parental rights.

11. Compliance with Service Plan:

11.1 [Appellant] is ORDERED, pursuant to § 263.106 Texas Family Code, *to comply with each requirement set out in the Department's original, or any amended, service plan* during the pendency of this suit.

(Emphasis added.) Thus, the trial court ordered appellant to comply with the requirements set out in the FSP and informed her that the actions listed in the FSP were "necessary to obtain return of the children."

The FSP provided twelve "task[s]" or "service[s]" that appellant was required to complete, including "obtain[ing] and maintain[ing] legal and verifiable employment," "obtain[ing], pay[ing] for, and maintain[ing] appropriate housing, in which she [was to be] listed on the lease, for herself and her children," "refrain[ing] from allowing anyone with criminal or [DFPS] history to reside in her home," and granting DFPS "access to the home for scheduled and unscheduled visits." The FSP states that its "purpose is to help [the parent] provide [her] child with a safe environment." And it admonishes the parent, "If you are unwilling or unable to provide your child with a safe environment, your parental and custodial

20

duties and rights may be restricted or terminated or your child may not be returned to you."

On April 4, 2012, after a status hearing, the trial court found that appellant had reviewed and understood the FSP and it had advised appellant that "unless she [was] willing and able to provide the children with a safe environment, . . . her parental and custodial duties and rights may be subject to restriction or to termination or the children may not be returned to her." And the trial court adopted the existing FSP as if fully set out in its order. At trial, appellant testified that she received the FSP, "understood it was a court order," and "understood that [she] had to do [her] service in order to get [her] kids back." Thus, the FSP specifically established the actions necessary for appellant to obtain the return of her children, even if as a possessory conservator. And appellant understood that her performance of the actions listed in the FSP were necessary to obtain the return of her children.

The record also shows that the trial court appointed DFPS the temporary managing conservator of appellant's children on December 5, 2011, and the termination hearing commenced on May 14, 2013. Thus, appellant's children were in the conservatorship of DFPS for not less than nine months. *See* TEX. FAM. CODE ANN. § 161.001(1)(O).

In addition, DFPS's evidence in support of its removal of the three minor children included the affidavit of caseworker Magee, indicating that she had received a referral for neglectful supervision and physical neglect of appellant's children. In her affidavit, Magee detailed her investigation, as well as that conducted by Lofton, including the same facts that she and Lofton later presented at trial regarding the unsanitary conditions observed inside appellant's apartment in 2010 and 2011, i.e., mold, decaying trash, and insects; the children having been left unsupervised outside the apartment; the children appearing in a sick and dirty condition; and instances of domestic violence involving appellant. Magee further testified in her affidavit that the children were in "immediate danger." From Magee's testimony, the trial court determined that there was sufficient evidence to satisfy a person of ordinary prudence and caution that the three minor children faced immediate danger to their physical health or safety, an urgent need to protect them required their immediate removal, and they faced a substantial risk of a continuing danger if they were returned home. *See In re E.C.R.*, 402 S.W.3d at 248 (relying on caseworker's affidavit in support of removal request). This evidence established that the children were in fact removed from appellant under Chapter 262 for abuse or neglect. *See id.* at 248–49; *see also* TEX. FAM. CODE ANN. §§ 161.001(1)(O), 262.001–.309.

Further, the trial testimony shows that appellant failed to comply with material provisions of the FSP, namely, she failed to obtain legal and verifiable employment, failed to obtain and maintain appropriate housing, allowed a person with a criminal and DFPS history to reside in her home, and refused to allow DFPS caseworkers access to her home for inspection. And appellant admitted that she had not completed all of the requirements of the FSP and understood that the trial court could terminate her parental rights solely on this basis.

Viewing the evidence in the light most favorable to the jury's findings, we conclude that the jury could have formed a "firm belief or conviction" that appellant failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children, who had been in the temporary managing conservatorship of DFPS for not less than nine months as a result of the children's removal from appellant under Chapter 262 for the abuse or neglect of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(O); *In re E.C.R.*, 402 S.W.3d at 249 (concluding that clear and convincing evidence showed that parent failed to comply with provisions of court order where parent did not dispute that she "failed to comply with numerous, material provisions of court orders that specifically required . . . compliance to avoid restriction or termination of parental rights"); *In re J.F.C.*, 96 S.W.3d at 277–79 (concluding that evidence that parents partially complied with court's

23

order specifying actions necessary to obtain return of children established as matter of law that parents failed to comply under section 161.001(1)(O)).

In addition, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that appellant failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children, who had been in the temporary managing conservatorship of DFPS for not less than nine months as a result of the children's removal from appellant under Chapter 262 for the abuse or neglect of the children. *See In re C.H.*, 89 S.W.3d at 18–19.

Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's finding that appellant failed to comply with the trial court's order. *See* TEX. FAM. CODE ANN. § 161.001(1)(O). We overrule the portion of appellant's sixth issue in which she argues that the evidence is legally and factually insufficient to support termination of her parental rights under section 161.001(1)(O). Thus, we need not address the remaining portions of her sixth issue or her third, fourth, or fifth issues.

*Best Interest*

In her seventh issue, appellant argues that the evidence is legally and factually insufficient to support the jury's finding that termination of her parental

rights is in the children's best interests because "there is no evidence to support the finding." *See* TEX. FAM. CODE ANN. § 161.001(2).

In determining whether the termination of appellant's parental rights is in the children's best interest, we may consider several factors, including (1) the children's desires, (2) the current and future physical and emotional needs of the children, (3) the current and future physical danger to the children, (4) the parental abilities of the parties seeking custody, (5) whether programs are available to assist those parties, (6) plans for the children by the parties seeking custody, (7) the stability of the proposed placement, (8) appellant's acts or omissions that may indicate that the parent-child relationship is not proper, and (9) any excuse for appellant's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.,* 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *See In re C.H.*, 89 S.W.3d at 27.

In regard to the minor children's desires, Williams testified that the oldest child referred to hardship, hunger, and uncertainty when she lived with appellant, and she wished to remain living with her aunt, Ruthie. Although the middle child missed appellant, she acknowledged that she is "in better care in the care of her

aunt." The youngest child's desires are not in the record. All three children refer to Ruthie as "momma."

In regard to any current and future physical danger to the children, Magee, Lofton, and Ruthie testified regarding instances of domestic violence that occurred while the children were present in appellant's home in May 2010 and September 2011. Magee further testified that unsanitary conditions, which pose a physical danger to the children, persist at appellant's home. During her visit to appellant's home on November 15, 2011, which was eighteen months after the children had been removed, Magee noted that the house was still dirty, "smelled like a dumpster," and was infested with roaches in the kitchen. There were pots and plates stacked in the kitchen with food on them. And when Magee attempted to talk with appellant about the condition of her home, appellant "just laughed."

Sasser opined that "the children will face substantial dangers to their physical health and emotional development if placed in [appellant's] care." Although she attempted three times to see the current condition of appellant's apartment, she was refused entry. Sasser noted that appellant is unable to demonstrate that she has learned anything from her parenting classes, she has had multiple DFPS referrals, and she consistently refuses to accept responsibility for the children being removed from her care. Also, appellant is "hostile," and she has failed or refused to provide a safe, clean, stable home; failed to obtain and maintain

26

employment in order to support her children; and resisted court-ordered anger management classes and taking the steps necessary to establish a proper and safe parental relationship. Sasser "strongly" stated her opinion that it is in the best interest of the children that appellant's parental rights be terminated.

In regard to the children's current and future physical and emotional needs, Wright testified that the children require heightened direction and attention. Further, the record shows that the two-year-old has asthma and requires nebulizer treatments. And appellant conceded that she has let her Medicaid coverage lapse. As for future plans for the children by the parties seeking custody, appellant testified that she intends to live with the children in her boyfriend's apartment and rely on his income and food stamps for support. She has been unemployed since January 2011, but intends to find a job.

In regard to the stability of the proposed placement, a favorable home study has been completed on Ruthie. She is licensed to provide foster care and has been in her home for two years. Sasser has met with the minor children, and she opined that they are in a safe, healthy, and secure environment. They have bonded with Ruthie, and Sasser recommended that the children remain with Ruthie, with the goal that she adopt them. The record supports an implied finding that Ruthie can provide for the children's physical and emotional needs.

Considering this evidence in the light most favorable to the jury's finding, we conclude that the jury could have reasonably formed a firm belief or conviction that termination of appellant's parental rights was in the children's best interests. And, considering the evidence in a neutral light, the jury could have reasonably formed a firm belief or conviction that termination of appellant's parental rights was in the children's best interests. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's finding that termination of appellant's parental rights was in the children's best interests.

We overrule appellant's seventh issue.

### Deemed Admissions

In her second issue, appellant argues that the trial court erred in granting DFPS's motion to withdraw and amend deemed admissions because "DFPS did not show, and could not have shown, good cause for withdrawing the admissions," appellant "would suffer no undue prejudice as a result of the withdrawal," or "presentation of the merits would be subserved by the withdrawal."

During trial, appellant objected to "any testimony" by DFPS caseworker Lofton "regarding negligence or abuse" of the children because it was "contrary to [DFPS's] admissions," and the trial court overruled the objection. Appellant asserted that DFPS had failed to answer all of her requests for admission, noting that although she had propounded thirty requests, which were not numbered, DFPS

28

did not respond beyond the thirteenth request. Thus, appellant concludes, the matters raised in the unanswered requests were conclusively established against DFPS. Specifically, appellant requested that DFPS not be allowed to put on evidence contrary to requests for admission numbers twenty through thirty. The included requests concerned whether "the children exhibited . . . evidence of abuse or neglect at the time [DFPS] filed this suit," "[i]t is in the best interest of the children to live with [appellant]," and "[i]t is . . . detrimentally harmful for the children to live with [appellant]."

In regard to appellant's objection, the trial court noted that it appeared that the pages containing the requests had been cut off during a facsimile transmission, and DFPS asserted that it, prior to appellant's in-court objection, did not know of the missing pages. It then requested leave to file a motion to withdraw the admissions, which the trial court granted.

The next day, DFPS filed its motion to which it appended the affidavit of Assistant County Attorney D'Ann Carlson, who testified that the failure to timely respond to appellant's requests for admission was a "mistake." At the hearing on the motion, Carlson, on the record, explained that the last two pages of appellant's requests for admission had been inadvertently omitted when DFPS transferred the questions to the document that it used to respond. Carlson argued that appellant would not be prejudiced by the withdrawal of the admissions because, for instance,

29

appellant could not have relied on DFPS admitting that it was in the best interest of the children to be returned to appellant because it ran contrary to DFPS's position at all the prior hearings, permanency reports, and in their responses to interrogatories and requests for production.

Appellant responded that DFPS should have realized the mistake, Carlson's affidavit testimony was incompetent because it lacked any statement of the facts surrounding DFPS's mistake, and appellant was prejudiced because she relied upon the admissions in preparing her defense.

The trial court found that DFPS had shown good cause for not fully responding to appellant's requests for admission, appellant would not be surprised or prejudiced by DFPS's amended answers, and presentation of the trial would be served by the withdrawal because the jury would otherwise be misled.

When a party does not serve responses to requests for admissions within thirty days, the matters in the requests are deemed admitted against that party. TEX. R. CIV. P. 198.2; *Wal–Mart Stores, Inc., v. Deggs*, 968 S.W.2d 354, 355 (Tex. 1998). A matter admitted is conclusively established unless the trial court permits withdrawal or amendment of the admission. TEX. R. CIV. P. 198.3. And a trial court has broad discretion to permit or deny withdrawal of deemed admissions, but it may not do so arbitrarily, unreasonably, or without reference to guiding rules or principles. *Wheeler v. Green*, 157 S.W.3d 439, 443 (Tex. 2005). Withdrawal or

30

amendment of an admission is permitted on findings of good cause, the party relying on the deemed admission will not be unduly prejudiced, and presentation of the merits will be served by the withdrawal. *See* TEX. R. CIV. P. 198.3; *Deggs*, 968 S.W.2d at 356.

"Good cause is established by showing [that] the failure involved was an accident or mistake, not intentional or the result of conscious indifference." *Wheeler*, 157 S.W.3d at 442. Here, Carlson argued, without objection, that the last two pages of appellant's requests for admissions had been inadvertently omitted when DFPS transferred the requests to the document that DFPS used to respond. She explained that she was unaware that pages had been omitted until appellant raised the issue of deemed admissions at trial. The trial court could have concluded that the failure involved resulted from an accident or mistake and was not intentional or the result of conscious indifference. *See id.* "Even a slight excuse will suffice. . . ." *N. River Ins. Co. of N.J. v. Greene*, 824 S.W.2d 697, 700 (Tex. App.—El Paso 1992, writ denied).

In support of her assertion that DFPS cannot meet its burden to show good cause, appellant relies on *Morgan v. Timmers Chevrolet, Inc.*, 1 S.W.3d 803, 807 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). In *Morgan*, however, the plaintiff notified the defendant that it had failed to respond to all of the plaintiff's requests for admission, and the defendant again failed to respond. *Id.* Here, DFPS

31

was not aware that certain pages of appellant's requests for admission were missing until appellant raised the matter at trial.

"Undue prejudice depends on whether withdrawing an admission or filing a late response will delay trial or significantly hamper the opposing party's ability to prepare for it." *Wheeler*, 157 S.W.3d at 443. "[P]resentation of the merits will suffer (1) if the requesting party *cannot* prepare for trial [or] (2) if the requestor *can* prepare but the case [will be] decided on deemed (but perhaps untrue) facts . . . ." *Id.* at 443 n.2. Appellant argues that she was prejudiced because she relied on the deemed admissions in preparing her case and would not be prepared to continue trial if the admissions were withdrawn.

The trial court concluded that either appellant's counsel or appellant had appeared at "every hearing" held in the case and, "in every single one of those hearings," as well as in every progress and permanency report that had been filed, DFPS had presented a position contrary to the admissions that appellant claimed she relied on. Appellant agreed, stating that she "definitely" knew that DFPS was "opposed to [her] having the children, yes."

Moreover, appellant asserts that her requests for admission "were designed to 'eliminat[e] matters about which there [was] no real controversy,'" citing *Wheeler*, 157 S.W.3d at 443 (noting that requests for admission are intended to address uncontroverted issues). The admissions upon which appellant seeks to

32

rely, however, embrace controverted issues that go to the heart of this case, namely, whether "the children exhibited . . . evidence of abuse or neglect at the time [DFPS] filed this suit," "[i]t is in the best interest of the children to live with [appellant]," and "[i]t is . . . detrimentally harmful for the children to live with [appellant]."  A party may not use deemed admissions to try to preclude a presentation of the merits.  *See id.*  Accordingly, we hold that the trial court did not abuse its discretion in allowing DFPS to withdraw and amend its deemed admissions.

We overrule appellant's second issue.

## Comment on the Weight of the Evidence

In her eighth issue, appellant argues that the trial court deprived her of her right to a fair trial because it "improperly commented on the weight of the evidence."  Appellant asserts that when DFPS non-suited one of the alleged fathers, the trial court "impermissibly offered [its] personal shock that someone [appellant] had alleged was a father was proven not to be."  Appellant argues that "[t]he prejudicial nature of this comment becomes most clear in the context of the trial strategy against [appellant], which was to paint her as a sexual deviant who slept with many unknown men."  She asserts that the trial court's remarks probably prejudiced the jury and caused the rendition of an improper verdict.  *See* TEX. R. APP. P. 44.1.

The record shows that the surrounding context of the trial court's complained-of comment to the jury was as follows:

> Good morning, ladies and gentlemen. Thank you very much for your patience. I want to let you know no one here has been goofing off. We've actually been working on several issues over several days. *We had something happen that I've never seen happen in about 15 years that I've been working on these cases. One of the folks that was alleged to be an unknown father* **was actually located in the middle of trial**. We've been having DNA done and **actually had that person come up here**, had him tested, had the kids tested. Long story short, he was ruled out this morning by DNA, so he is no longer a party to this suit. As you can see, [counsel for alleged father] who represented that person's interest is no longer here. Just wanted y'all to know kind of what was going on. And for the record, I think [counsel for alleged father] said in 46 years of handling these types of cases, he's never seen something like this *happen actually at trial*.

(Emphasis added.)

The record does not show that appellant objected to the trial court's comments; therefore, no issue has been preserved for appeal. *See* TEX. R. APP. P. 33.1.

Accordingly, we overrule appellant's eighth issue.

**Fact Witness Testimony**

In her ninth issue, appellant argues that the trial court erred in allowing V'Lillian Wright to testify because DPFS did not qualify her as an expert and her testimony was not based on personal knowledge.

A trial court's decision to admit evidence is reviewed under an abuse of discretion standard. *In re J.P.B*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court

34

abuses its discretion when it acts without reference to any guiding rules and principles or in a way that is arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241–42 (Tex. 1985). And a party complaining of error in the admission of evidence must also show that the trial court's error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *Fairmont Supply Co. v. Hooks Indus., Inc*., 177 S.W.3d 529, 532 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Appellant asserts that the trial court acknowledged in general that Wright did not "have personal knowledge." The record reflects that the trial court ruled that Wright did not "have personal knowledge of" whether the children saw anything during the domestic violence incident at Ruthie's house in September 2011. Wright testified that she talked with two of the children after the incident, and they were "present" during the incident and "very concerned about the feelings of Aunt Ruthie . . . ." Wright did not testify regarding whether the children saw anything.

Appellant next asserts that the trial court erred in allowing Wright to "offer her professional judgment of what [appellant] needed to do to see her children returned." The record shows that although Wright discussed parenting in general, she specifically declined to offer an opinion regarding "concrete, specific things":

> [DFPS]: In order for [appellant] to get her children back, returned to her care, what *would you like to* see as the children's therapist?

35

[Wright]:       I think [appellant] needs to be aware of her parenting style and to understand if it is effective for raising her children in a more sound and productive way that they can become good citizens. And if she is aware of that, and she can prove that she can do parenting in a manner that the children would be safe and productive, then I would like to see it happen because every parent would love to have their children, but parenting is hard.

. . . .

[DFPS]:         So what concrete, specific things would you like to see in place before the children would be returned to her care?

[Wright]:       I don't know [appellant], so I don't know what else is all involved.  I only work with the children, but I don't think it is my say what she needs to do and really know exactly what steps she needs to take.

(Emphasis added.)

Because the record does not support appellant's assertions, she has not shown that the trial court abused its discretion in allowing Wright's testimony. Accordingly, we overrule appellant's ninth issue.

## Business Records

In her tenth issue, appellant argues that the trial court erred in not striking certain therapy notes regarding the children because it "acknowledged that it had admitted inadmissible evidence."

Constance Williams, a licensed professional counselor employed by Kinghaven Counseling, testified that she was the therapist for the three minor children, and counsel for the children sought to admit treatment documents from Williams's individual sessions with them.  Williams testified that she is familiar

with the records, as it is Kinghaven's regular practice to reduce her notes to written records, the records are kept in the regular course of business, and the records were created at or near the time of the events in question. Appellant objected, "Judge, I don't think the entire predicate has been laid." Without making an express ruling, the trial court admitted the records into evidence.

It is well established that "a general objection to an insufficient predicate" fails to preserve error; rather, a specific objection must be made. *Seymour v. Gillespie*, 608 S.W.2d 897, 898 (Tex. 1980). Thus, appellant's general objection that she did not "think the entire predicate ha[d] been laid" did not preserve the issue. *See* TEX. R. APP. P. 33.1; *Gillespie*, 608 S.W.2d at 898; *see also In re S.H.*, 10-02-086-CV, 2004 WL 254011, at *4 (Tex. App.—Waco Feb. 11, 2004, no pet.) (mem. op.) (holding that general complaint that Department did not lay predicate for admission of psychological report on child did not preserve error).

Accordingly, we overrule appellant's tenth issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

37